J-S17003-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: U.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.B., FATHER | : | No. 251 MDA 2021 |

Appeal from the Decree Entered January 27, 2021
In the Court of Common Pleas of York County
Orphans' Court at No:  2020-0187,
CP-67-DP-0000191-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: U.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.B., FATHER | : | No. 252 MDA 2021 |

Appeal from the Order Entered January 27, 2021
In the Court of Common Pleas of York County
Juvenile Division at No:  2020-0187,
CP-67-DP-0000191-2019

BEFORE:   STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED JULY 13, 2021**

S.B. ("Father") appeals the decree entered on January 27, 2021, which terminated involuntarily his parental rights to his daughter, U.H. ("Child"), born in May 2018.  In addition, Father appeals the order entered that same day, that changed Child's permanency goal from return to parent or guardian

_____

[*] Retired Senior Judge assigned to the Superior Court.

to adoption.[1]  After review, we affirm the termination decree and dismiss the appeal from the goal change order as moot.

The record reveals that the York County Office of Children, Youth and Families ("CYF") became involved with Child in August 2018 due to concerns regarding Mother's ability to address Child's special medical needs.  Child had been born prematurely and needed a tracheotomy, g-tube, and pulse-oxygen machine.  CYF closed the case in March 2019, concluding that there were no concerns for Child's safety at that time.  However, CYF became involved again in June 2019, due to concerns regarding Mother's mental health and ability to care for Child upon her discharge from the hospital.  Hospital staff informed CYF that Mother was behaving erratically and failing to comply with medical instructions regarding Child's care.  Meanwhile, Father did not involve himself in Child's life and requested paternity testing, which eventually confirmed he was Child's parent.  CYF filed an application for emergency protective custody of Child on July 17, 2019, which the trial court granted by order entered July 18, 2019.  The court held a shelter care hearing on July 18, 2019 and entered a shelter care order on July 22, 2019.  CYF filed a dependency petition on July 19, 2019, held a dependency hearing on July 29, 2019, and adjudicated Child dependent by order entered that same day.  The court placed Child in the care

---

[1] The trial court's decree also terminated the parental rights of Child's mother, A.H. ("Mother").  Mother did not appeal the termination decree or goal change order.

of her maternal grandmother, with whom she has resided since her discharge from the hospital in approximately August 2019.

Importantly, Father is a registered sex offender and was on probation at the time of Child's placement due to convictions of indecent exposure and indecent assault. He incurred a driving under the influence charge, violated his probation, and was incarcerated in September 2019. Although our review of the record does not reveal the ultimate disposition of this charge, Father was released from incarceration in May 2020. Father was then involved in a serious accident in June 2020 and broke his neck. He was partially paralyzed for a time and resided at a physical rehabilitation facility. It is not clear exactly when Father left the facility, but he was no longer residing there by the time of a status review hearing on September 16, 2020.

On October 30, 2020, CYF filed a petition to terminate Father's parental rights to Child involuntarily. CYF filed a petition to change Child's permanent placement goal from return to parent or guardian to adoption on November 2, 2020. The trial court held a hearing on the petitions on January 22, 2021, at the conclusion of which it announced it would terminate Father's rights and change Child's goal.[2] The court entered a decree and order memorializing its decisions on January 27, 2021. The court also entered a separate order that

---

[2] The trial court appointed a single attorney, Ann Marie McElwee, Esquire, to act as both Child's legal counsel and guardian *ad litem* during the proceedings. Attorney McElwee indicated at the hearing that no conflict appeared to exist between Child's legal interests and best interests, as Child was less than three years old at the time and had a limited vocabulary. N.T., 1/22/21, at 185-87.

- 3 -

same day, which it had dictated during the hearing, explaining its decisions. Father timely filed separate notices of appeal, along with concise statements of errors complained of on appeal, on February 22, 2021.

Father raises the following claims on appeal:

I. Whether the trial court erred in changing the goal from reunification to adoption, wherein no reasonable efforts were provided to [Father] prior to the filing of the motion to change court ordered goal[?]

II. Whether the trial court erred in terminating the parental rights of [Father] pursuant to Sections 2511[(a)](1), (2), and (8) of the Adoption Act, wherein CYF failed to provide any meaningful services to [Father] to promote reunification[?]

III. Whether the trial court erred in councluding [*sic*] that termination of parental rights would best serve the needs and welfare of the child pursuant to Section 2511(b) of the Adoption Act[?]

Father's Brief at 5 (unnecessary capitalization and Father's suggested answers omitted).

We begin by addressing the involuntary termination of Father's parental rights, which he challenges in his second and third issues. Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously

- 4 -

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate pursuant to Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> ***

- 5 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

Trial courts adhere to the following analysis when considering whether to grant a termination petition pursuant to Section 2511(a)(2):

. . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). As we have explained, Section 2511(a)(2) does not apply solely to instances of affirmative misconduct but also permits termination based on a parent's incapacity. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). "[A]

parent's incarceration is relevant to the [S]ection [2511](a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

In the matter at bar, the trial court did not draft a detailed explanation of its decision to terminate Father's parental rights. The court instead issued a brief opinion directing our attention to its statements on the record at the conclusion of the hearing, which it had entered as a separate order on January 27, 2021. The order explains the court's decision as follows, in relevant part:

> In looking at the orders and noting specifically Exhibit 10,[3] [F]ather had questioned paternity and was hesitant to become significantly involved until paternity testing occurred. He was not determined to be the father until August 7th, 2019. Shortly thereafter, he was incarcerated from September of 2019 until May of 2020, and then unfortunately in June of 2020 he was in a very serious car accident where he broke his neck and was in rehab for a substantial period of time. He is still receiving some physical therapy and recovering from his injuries.
>
> The court does note that he has had some substantial obstacles in being able to parent the child. Included in that are restrictions during his period of incarceration and hospitalization and rehab because of the COVID restrictions. He continues, to his credit, to acknowledge that he does have a lot on his plate especially associated with his ongoing requirements due to his criminal charges as well as his physical limitations.
>
> The court does appreciate that there are some criminal charges that raise concerns about safety and parenting and some

---

[3] CYF Exhibit 10 is a domestic relations order finding Father to be the biological father of Child.

that do not. Mother's retail theft from many years ago does not. The ones that most concern the court are those involving sex, drugs and violence. Unfortunately, [F]ather's criminal charges involve all three. Therefore, his ongoing commitment to the requirements of probation are extremely important and would require some specific attention to ensure that he has moved forward such that there are no safety concerns for even a normal child, but this is not a normal child.

\*\*\*

The second section indicates repeated and continued incapacity, abuse, neglect or refusal of a parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. In looking at this section as a whole as it relates to [F]ather, it is an incapacity in part created by his physical limitations and incarceration, and he has not been able to remedy those within the time frame allotted.

\*\*\*

Therefore, the court does find that . . . grounds have been established to terminate [F]ather's parental rights.

Order, 1/27/21, at 2-6.

Father argues that the trial court erred by terminating his rights because he can remedy his parental incapacity. Father's Brief at 25. He suggests that he may have made more progress toward reunification by the time CYF filed its termination petition if it had provided him with adequate services. *Id.* He also contends that he maintained contact with Child to the extent he was able to, and that the circumstances leading to Child's placement in foster care are no longer present. *Id.* at 24-27.

Father's claim is meritless. Initially, to the extent Father contends the trial court erred by terminating his parental rights because CYF did not provide him with adequate services, our Supreme Court has held that reasonable reunification efforts are not a prerequisite to involuntary termination pursuant to Section 2511(a)(2). *See In re D.C.D.*, 105 A.3d 662, 676 (Pa. 2014) (concluding the Superior Court erred by reversing termination because of the agency's failure to provide reasonable efforts).

Further, Father's insistence that he will be able to remedy his parental incapacity is disingenuous given his own testimony during the hearing that he cannot care for Child and will not be able to care for Child in the future. Father testified as follows during direct examination:

> Q. Okay. And I think you heard some testimony, [Father], today regarding whether or not you would be in a position today to have your daughter reunified with you.
>
> Do you believe that would be something that could happen today or in the near future? What is your position with regard to that?
>
> A. With me having my own health issues and other issues, court problems and stuff going, that [*sic*] I don't think I would be able to meet the needs that she needs.
>
> Q. Are you talking about right now or in the near future as well?
>
> A. Right now and in the future. I don't know.

N.T., 1/22/21, at 176-77.

Our review of the record supports Father's assessment of his parenting abilities during the hearing. As we summarized above, Father is a registered

- 9 -

sex offender, and his criminal history includes convictions of indecent assault and indecent exposure. Order of Adjudication and Disposition, 7/29/19, at 1; N.T., 1/22/21, at 20-21. Father incurred a driving under the influence charge, violated his probation, and was incarcerated from September 2019 until May 2020. Permanency Review Order, 6/22/20, at 2; N.T., 1/22/21, at 21-23. In June 2020, shortly after his release, Father was involved in a serious accident and broke his neck. Permanency Review Order, 6/22/20, at 2; N.T., 1/22/21, at 134. Although Father had left his physical rehabilitation facility by at least September 2020, he did not provide CYF with documentation demonstrating a lawful source of income, and CYF did not know whether he was able to obtain stable and appropriate housing. Permanency Review Order, 6/22/20, at 2; Status Review Order, 9/22/20, at 3; N.T., 1/22/21, at 87-88.

It is also important to recognize Child's significant medical needs. York County Early Intervention caseworker, Allison Yinger, described Child's needs as a "nine or ten" out of ten in terms of their severity.[4] N.T., 1/22/21, at 74-75. CYF caseworker, Marla Speir, testified Child would be having four different surgeries in January 2021 alone. *Id.* at 106. Ms. Speir reported that Father never attended any of Child's medical appointments and did not even seem to

---

[4] According to a letter that Child's former nurse practitioner prepared, Child's medical history is "significant for prematurity @ 23 weeks, bronchopulmonary dysplasia, pulmonary hypertension, feeding difficulties s/p g-tube placement, PDA s/p ligation, ROP, IVH grade II and developmental delays." CYF Exhibit 6.

know what Child's medical needs were. *Id.* at 106-10. Considering Father's circumstances together with Child's demanding medical needs, it is apparent that Father cannot parent Child now and will not be able to parent Child within anything approaching a reasonable time. Therefore, we discern no abuse of discretion by the trial court, and we affirm the termination of Father's rights pursuant to Section 2511(a)(2).

We next consider the termination of Father's parental rights pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (citations and quotation marks omitted).

The trial court offered the following rationale for its decision to terminate pursuant to Section 2511(b), in relevant part:

> Also, the court notes under Section (b) of the statute the court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. . . .
>
> ***
>
> Where in some cases Section (b) of the statute is a bit of a throwaway, in this case it is extremely important. What is notable here is that this grandmother has changed her life for this child. She has gone above and beyond in addressing the extremely significant needs of this child. As testified to by the Early Intervention specialist, even though she is experienced in dealing with numerous children with special needs, this child has been a nine to a ten on that scale. Grandmother has been extremely attentive to numerous doctors' appointments not only here in York but also in Hershey and Philadelphia. She has been shockingly consistent through difficult circumstances in providing ongoing care to the point that 24/7 nursing care is no longer needed.
>
> This child is extremely bonded to the grandmother and there is no question that at this point she is the only one who is capable of even coming close to address[ing] this child's needs without significant ongoing outside services.
>
> Therefore, having found that . . . it is absolutely in the best interests of this child to remain with the grandmother, the court is terminating the rights of . . . father at this time.

Order, 1/27/21, at 6-10.

Father contends terminating his parental rights would not serve Child's needs and welfare because he faced substantial obstacles, most of which were beyond his control, that impaired his ability to bond with her. Father's Brief at 29. Father further asserts that he and his family could "continue to support" Child if he maintained his parental rights, and that "[s]evering [] Child's bond

with Father and extended family members cannot be deemed to be in [] Child's best interests." *Id.*

The record supports the trial court's decision. It is evident that Child does not share a meaningful bond with Father. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa. Super. 2017) (instructing, "a child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time."). Father did not involve himself in Child's life after her birth in May 2018 and questioned paternity. Order of Adjudication and Disposition, 7/29/19, at 1. He was then incarcerated from September 2019 until May 2020 and had no contact with Child during his incarceration. N.T., 1/22/21, at 23, 122. Father first began having contact with Child sometime after his release, receiving telephone and video calls due to the COVID-19 pandemic. *Id.* at 91, 122-25; Status Review Order, 9/22/20, at 3. While CYF resumed offering in-person visits in July 2020, Ms. Speir's testimony suggests Father did not request in-person visits until December 2020. N.T., 1/22/21, at 98, 124, 128-29. Ms. Speir testified she referred Father for in-person visits through Pressley Ridge, but he did not complete his intake appointment.[5] *Id.* at 98-99. Father

---

[5] Despite this testimony, Ms. Speir testified that Father saw Child "in person a couple times[.]" N.T., 1/22/21, at 96. Likewise, Father testified he saw Child "about two times in person." *Id.* at 177. It is possible this testimony indicates Father had only two video calls with Child, but that is not clear from the record. *See* N.T., 9/16/20, at 33 ("When he was in his rehab, he did
*(Footnote Continued Next Page)*

acknowledged during his own testimony that he had little contact with Child and did not share a bond with her. *Id.* at 177 ("I would like to get to know her better and I need to meet her in person more often. . . . I would like to get to know her personally, you know what I mean, have a bond with her.").

In contrast, Child has resided with her maternal grandmother since her discharge from the hospital in approximately August 2019. *Id.* at 91-92; Order of Adjudication and Disposition, 7/29/19, at 3. The record reveals that Child views her maternal grandmother as the primary parental figure in her life and refers to her as either "[M]om" or "Gamaw." N.T., 1/22/21, at 92, 96. Moreover, as the trial court observed, the maternal grandmother has done an exemplary job of addressing Child's special medical needs. Ms. Speir described the grandmother's efforts as "phenomenal," explaining, "every need of [Child's] is taken care of by [the grandmother] and she is passionate . . . she keeps us informed on everything. She understands this child's medical needs as well as the doctors do[.]" *Id.* at 92-93. Thus, we discern no abuse of discretion by the trial court in concluding that termination of Father's parental rights will best serve Child's needs and welfare, and we affirm the termination decree pursuant to Section 2511(b).

_____

contact the child [via telephone] almost every day after he got out. There was a text message . . . to begin Zoom visits . . . . there's only been two Zoom calls since probably July."); Status Review Order, 9/22/20, at 3 ("While in rehab, Father spoke with the [c]hild by phone daily. That stopped when he was released from rehab. During this reporting period, Father has only had 2 Zoom sessions with the [c]hild since July, 8/12 and 8/26.").

We finally turn our attention to Father's first claim on appeal, in which he challenges the change of Child's permanent placement goal from return to parent or guardian to adoption. Given our decision to affirm the trial court's termination decree, any challenge to the goal change order is moot. ***In the Interest of D.R.-W.***, 227 A.3d 905, 917 (Pa. Super. 2020) ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees.").

However, even reaching the merits of this claim, we would conclude that it is meritless. When reviewing a goal change order, this Court adheres to an abuse of discretion standard of review. ***Id.*** We must accept the trial court's factual findings and credibility determinations if the record supports them but need not accept the court's inferences or legal conclusions. ***Id.***

The Juvenile Act governs goal change proceedings. ***See*** 42 Pa.C.S.A. §§ 6301-6375. We have explained the pertinent analysis as follows:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Father challenges the trial court's goal change order by asserting that he made progress toward remedying the causes Child's placement, and that obstacles beyond his control impaired his ability to make greater progress, such as CYF's failure to provide him with adequate services. Father's Brief at 20-21. For the reasons discussed above, the record confirms changing Child's goal to adoption would be in her best interest. *See A.B.*, 19 A.3d at 1088-89. Father is incapable of parenting Child and does not have a meaningful bond with her. Child has a meaningful bond with her maternal grandmother, who has shown she can address Child's significant medical needs.

Moreover, regarding Father's contention that CYF failed to provide him with adequate services, we acknowledge this Court has continued to indicate trial courts should not change a child's goal to adoption if an agency has not provided reasonable reunification efforts. *See In the Interest of T.M.W.*, 232 A.3d 937, 947-49 (Pa. Super. 2020) (concluding that the trial court erred by changing the goal to adoption where, among other things, the mother did not receive reasonable efforts). This is so even though reasonable efforts are not generally a prerequisite to the termination of parental rights and a trial court may terminate without first changing the goal to adoption. *See D.C.D.*, 105 A.3d at 672-76; *In re Adoption of S.E.G.*, 901 A.2d 1017, 1029 (Pa. 2006) ("We conclude that Section 6351 does not require that a goal change

precede the filing of a termination petition."). Nonetheless, in this case, Ms. Speir testified Father did not take advantage of the services available to him:

> I did discuss services . . . and at that time he specifically stated he is not in a position to take care of this child. So, not that he didn't want services, it's that he doesn't need to work on services because he's not working on reunification. . . .
>
> ***
>
> Other than that, there were no other services offered because I had three conversations with [F]ather that he's not in the position to take this child in. He just wants to be able to see her.

N.T., 1/22/21, at 126-131. We conclude, therefore, that Father's goal change claim would be meritless even if it were not moot.

Based on the foregoing analysis, we discern no abuse of discretion or error of law in the trial court's decision to terminate Father's parental rights to Child involuntarily, and we affirm the court's January 27, 2021 termination decree. Because any challenge to the change of Child's permanent placement goal is moot given our decision to affirm the termination decree, we dismiss the appeal from the January 27, 2021 goal change order.

Decree terminating Father's parental rights affirmed. Appeal from the goal change order dismissed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/13/2021